UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHIRLEY C. McMILLIAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4: 19 CV 905 DDN |
| ) | |
| ANDREW M. SAUL,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying in part the application of plaintiff Shirley C. McMillian for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on June 21, 1952. She was 62 years old at the time of her alleged onset date of June 30, 2014. (Tr. 146.) She filed her application on October 20, 2015, claiming disability due to Fuchs' dystrophy,[2] bilateral senile nuclear cataract, dysphagia or difficulty swallowing,

---

[1] The Court takes judicial notice that on June 4, 2019, the Hon. Andrew M. Saul became the Commissioner of Social Security. See https://www.congress.gov/nomination/116th-congress/94. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of 42 U.S.C. § 405(g) (last sentence).

[2] Fuchs' dystrophy causes the cornea (clear layer on the front of the eye) to swell. The disorder can lead to glare, cloudy vision and eye discomfort. Fuchs' dystrophy usually affects both eyes and can cause vision to gradually worsen over years. But most people with Fuchs' dystrophy don't develop symptoms until they reach their 50s or 60s. https://www.mayoclinic.org/diseases-conditions/fuchs-dystrophy/symptoms-causes/syc-20352727 (last visited January 31, 2020).

migraine headaches, muscle pain, respiratory difficulties, anxiety, depression, osteoporosis/osteopenia, fatigue, and loss of contrast and dark adaption vision. (Tr. 169.) Her application was denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 85.)

On June 15, 2018, following a hearing, an ALJ issued a decision awarding benefits effective July 13, 2017 through the date of the decision. (Tr. 15-25.) The Appeals Council denied her request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to this appeal.

On April 15, 2014, plaintiff was seen at Washington University Eye Center complaining of poor vision. She reported that when she renewed her drivers' license, she had difficulty with peripheral vision, necessitating a restriction on her drivers' license. She was diagnosed with Fuchs' Dystrophy, a cataract, and allergies. Her best corrected vision (the best vision using correction with glasses or contacts) was 20/30 and 20/40. (Tr. 432-33.)

On October 24, 2014, at a 6-month follow-up, plaintiff reported that she didn't think her vision was any better even with new glasses. Her best corrected vision was 20/40 and 20/60. (Tr. 430-31.)

On December 30, 2014, plaintiff was seen for headache, facial numbness, and back pain. She denied any significant vision changes. She was prescribed Flexeril, a muscle relaxant. (Tr. 337.)

On May 19, 2015, plaintiff saw John Hoffman, M.D., at BJC Medical Group, for a persistent cough. She also reported decreased vision and that letters on her television appeared "shadowed." She reported eye pain, itching, allergies, occasional redness, and a foreign body sensation in her eye. She was diagnosed with allergic rhinitis. (Tr. 323, 428-29.)

On July 7, 2015, plaintiff reported decreased vision at all distances. (Tr. 425-26.) On July 15, 2015, she underwent cataract removal and lens implantation in her left eye under Anthony

Lubniewski, M.D., at Washington University.  (Tr. 285.)  A week later she reported fluctuating vision with soreness to touch above her eyebrow.  Treatment notes state she was "doing well."  (Tr. 473-74.)

Plaintiff was seen at Washington University Allergy and Immunology Department on July 22, 2015 and diagnosed with allergies to many pollens and animals.  She was prescribed Albuterol, a nasal steroid inhaler, and instructed on reducing allergen exposure in her home.  (Tr. 410.)

On July 23, 2015, plaintiff reported "flashes" in her left eye the day before, and "floaters" that morning.  She described vision in both eyes as "smoky."  (Tr. 408-09.)

On July 30, 2015, plaintiff reported having floaters, pain in her left eye, and an inability to read or see with her left eye.  Her best corrected vision was 20/30 and 20/50.  (Tr. 304, 401-03.)

On August 18, 2015, one month after surgery, plaintiff reported cloudy vision and other symptoms related to migraine headaches and that were unrelated to her cataract surgery.   On August 27, 2015, she reported both fogginess and a foreign body sensation in her left eye.  (Tr. 395-400.)

On September 29, 2015, plaintiff reported continued foreign body sensation and foggy vision in her left eye but decreased floaters and flashes.  She could not read well on her computer and was not comfortable driving.  She had increased glare in left eye and described her depth perception as "really off."  (Tr. 392-93.)

On October 27, 2015, plaintiff had 2/10 pain severity in her left eye.  On November 5, 2015, she reported a mild ache in her left eye, but no pain.  (Tr. 388-91.)

On December 1, 2015, plaintiff reported itching in her left eye and that it felt like the inflammation was returning.  On December 10, 2015, she reported similar symptoms in the same eye attributed to allergic conjunctivitis.  (Tr. 385-87.)

In a Function Report dated January 16, 2016, plaintiff listed daily activities that included food preparation, personal care, caring for her dog, using the computer, watching television, performing household chores, working out, caring for her own and her mother's personal business, socializing, and volunteering.  (Tr. 194.)

On February 23, 2016, plaintiff reported that her vision was "not that good," but that the swelling and discomfort had improved.  (Tr. 586-87.)

3

At the end of March 2016, plaintiff underwent cataract removal and lens implantation in her right eye. At an April 5, 2016 follow-up, she reported improved vision in her right eye. (Tr. 581-82.)

On May 12, 2016, plaintiff's corrected vision was 20/40 and 20/50. On May 27, 2016, plaintiff reported having difficulty with glasses, continued problems with reading, and increased pain in the left eye since resuming Pred Forte, a steroid eyedrop used to treat inflammation. She was unable to wear glasses all of the time. She felt fine while sitting, but felt nauseous when walking around wearing glasses, and her depth perception was poor. She needed light to read. Her best corrected vision was 20/50 bilaterally. (Tr. 575-77.)

On July 22, 2016, plaintiff was involved in a motor vehicle accident. A CT of her head and cervical spine showed no acute abnormalities. (Tr. 531.) On October 23, 2016, plaintiff reported aura, including flashing lights and sweating, and vomiting followed by headache for more than a year, occurring one to three times per week. Plaintiff thought eye strain was triggering the headaches. Excedrin migraine helped improve her symptoms. Suzanne Million, Physician's Assistant, diagnosed recurrent migraine headaches with aura. (Tr. 315-17.)

On December 1, 2016, plaintiff reported continued ocular itching and was diagnosed with allergic conjunctivitis. (Tr. 573-74.)

On December 2, 2016, plaintiff saw Samire Kirtane, M.D., for short term memory difficulties. An MRI showed mild central canal stenosis or narrowing of the mid-cervical and lower lumbar spine. Dr. Kirtane diagnosed post-concussion syndrome following her car accident and instructed her to get more involved with social activities and perform memory exercises. (Tr. 545-60.)

At a March 29, 2017 eye exam, plaintiff could not see any letters during "glare testing," used to quantify vision loss associated with light scatter. Her "pinhole vision," used to determine whether reduced visual acuity is due to a refractive error or to an organic vision disorder, was 20/60 and 20/50. During glare testing, her vision was 20/400 bilaterally. She was diagnosed with peripheral vision loss, dry eye syndrome, and conjunctival hemorrhage or burst blood vessel that was likely to resolve within three weeks. (Tr. 525-26.)

At a July 13, 2017 examination, plaintiff's best corrected vision was reduced to 20/70 in both eyes. (Tr. 567.)

**ALJ Hearing**

On February 6, 2018, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 31-63.) She has past work as a retention specialist that required a lot of reading. Her vision problems cause her to drop things. She has difficulty walking on sidewalks and stairs. She has difficulty reading on a computer and her comprehension is "not there." She has problems with glare and sees halos around objects. She has anxiety, as well as sciatica. She gets migraine headaches from straining her eyes. (Tr. 44-52.)

She takes Flexeril, which can make her sleepy, groggy, and dizzy. In January 2018, her eye doctor informed her that she may no longer drive. (Tr. 52-55.)

A vocational expert (VE) testified to the following. Plaintiff has past relevant work as an education specialist and training representative. The ALJ asked a hypothetical question about, among other things, an individual who must not perform work that requires full peripheral vision, depth perception, or far acuity, but has frequent near acuity, and who must not be required to read print smaller than an 8-point font. The VE testified that the individual could perform the job of education specialist but that she could not perform the job of training representative. The ALJ then queried about the same hypothetical except that the near acuity was reduced to occasional, and she must not be required to read print smaller than a 12-point font. The VE testified that neither job could be performed using that hypothetical. (Tr. 57-61.)

The VE testified that a hypothetical individual with best corrected vision of 20/70 has significant vocational limitations and is generally considered not able to work. (Tr. 57-61.)

### III. DECISION OF THE ALJ

On June 15, 2018, the ALJ issued a decision finding that plaintiff was disabled as of July 13, 2017. (Tr. 15-25.) At Step One of the sequential evaluation, the ALJ found that plaintiff had not performed substantial gainful activity since her June 30, 2014 alleged onset date. At Step Two, the ALJ found plaintiff had the following severe impairments: Fuchs' dystrophy, cataracts (status-post surgical removal and lens implantation), dry eye syndrome, degenerative disk disease of the cervical and lumbar spine, migraines, and osteoporosis/osteopenia. At Step Three, the ALJ found

that plaintiff did not have an impairment or combination of impairments that met or medically equals an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 17-18.)

The ALJ found that prior to July 13, 2017, plaintiff had the residual functional capacity (RFC) to perform "light" work except, among other things, she must not perform work which required full peripheral vision, depth perception, or far acuity, although she can perform work with frequent near acuity.  The ALJ also found plaintiff must not be required to read print smaller than an 8-point font.  (Tr. 19.)  With this RFC, the ALJ found plaintiff could perform her past relevant work as an education specialist.  (Tr. 23.)

The ALJ also found that, beginning July 13, 2017 and through the date of the decision, plaintiff had the RFC to perform "light" work except, among other things, she must not perform work which requires full peripheral vision, depth perception, or far acuity, but can perform work with occasional near acuity. She must not be required to read print smaller than a 12-point font. With this RFC, the ALJ found plaintiff could not perform her past relevant work.  At Step Five, the ALJ found that plaintiff did not acquire skills transferrable to other jobs within this RFC, and therefore, plaintiff was disabled as of July 13, 2017.  (Tr. 23-24.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve

6

continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in finding that she was not disabled prior to July 13, 2017, and that the ALJ should have found her disability began earlier based on her vision impairments. In support, she asserts the ALJ is not qualified to interpret ophthalmologic clinical findings to determine RFC and that the ALJ needed a medical expert in ophthalmology to correlate her clinical findings with functional, work-related limitations. She argues the ALJ failed to recognize that her Fuchs' dystrophy and status-post cataract removal may be contributing to her reduced vision. The Court disagrees.

In this case, the ALJ considered the medical evidence as well as plaintiff's activities in concluding plaintiff was not disabled prior to July 13, 2017. This court concludes the record supports the ALJ's determination that plaintiff was not disabled prior to July 13, 2017.

In determining the onset date of disability, the ALJ should consider the claimant's alleged date of onset, her work history, and the medical and other evidence of her condition. Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006). Here, shortly before she alleged she became disabled, plaintiff complained of poor vision and difficulty with peripheral vision, and stated that a driving

restriction had been added to her license. A visual acuity test showed her corrected vision was 20/30 on the right and 20/40 on the left. In October 2014, a few months after plaintiff alleges she became disabled, plaintiff reported decreased vision. Tests showed her corrected vision was 20/40 and 20/60. (Tr. 21, 430-32.)

In May 2015, plaintiff reported declining vision and that letters on her television appeared "shadowed." (Tr. 21, 428.) In July 2015, she underwent cataract removal and lens implantation in her left eye. (Tr. 21, 285.) A week later, she was doing well but reported fluctuating vision with soreness to touch above the eyebrow. (Tr. 21, 473-74.) Two weeks following surgery, her corrected vision was 20/30 in the right and 20/50 in the left. (Tr. 21, 304.) One month later, she complained of cloudy vision. (Tr. 21, 465.) In September 2015, she reported decreased floaters and flashes, but stated she couldn't read on the computer and wasn't comfortable driving due to poor depth perception. (Tr. 21, 458.) The following month, she had 20/40 and 20/50 "pinhole" vision (indicating her vision was correctible with glasses). (Tr. 21, 456.)

By May 2016, plaintiff continued to report vision problems. She felt nauseous and had difficulty with depth perception. Her corrected vision was 20/50 bilaterally. On May 12, 2017, her corrected vision was 20/40 and 20/50. On May 27, 2016, her corrected vision was 20/50 bilaterally. (Tr. 22, 575-77.)

In February 2017, plaintiff's corrected vision was 20/50 bilaterally. (Tr. 22, 571.) In March, she could not see any letters with glare testing and her pinhole vision was 20/60 and 20/50. During glare testing, her vision was 20/400 bilaterally. She was diagnosed with peripheral vision loss and dry eye syndrome. Treatment notes indicated bilateral hemorrhage that was likely to resolve within three weeks. (Tr. 22, 525-26.) In April, her corrected vision was 20/70 and 20/60. (Tr. 22, 569.) Therefore, the court agrees that while the record evidence supports visual limitations, the evidence is inconsistent with disabling limitations prior to July 13, 2017. Cf., Vance v. Berryhill, 860 F.3d 1114, 1120 (8th Cir. 2017) (claimant with history of special education and low IQ scores suggests some level of intellectual disability but was insufficient to demonstrate deficits in adaptive functioning needed to meet listing for mental retardation prior to age 22.)

Moreover, plaintiff's activities prior to July 13, 2017 are inconsistent with disabling visual limitations. In her Function Report dated January 16, 2016, plaintiff listed daily activities including food preparation, personal care, caring for her dog, using the computer, watching television,

8

performing household chores, working out, caring for and assisting her mother who had dementia, socializing, and volunteering. She also assisted her college-aged son who had learning disabilities. (Tr. 194.) These activities are inconsistent with plaintiff's claims of disabling vision limitations prior to July 13, 2017. See Wright v. Colvin, 789 F.3d 847, 854 (8th Cir. 2015) (ALJ properly found activities such as driving, shopping, bathing, and cooking were inconsistent with disabling symptoms).

With respect to RFC, the ALJ determined that prior to July 13, 2017, plaintiff's visual impairments made her incapable of working around unprotected heights, hazardous machinery, or lights brighter than those found in a standard office setting. The ALJ also found plaintiff could not perform work that required full peripheral vision, depth perception, or far acuity. The ALJ found plaintiff could perform work with frequent near acuity. (Tr. 19.) This finding is supported by the record evidence, as well as her daily activities, including driving. See e.g., Freerks v. Colvin, No. C14-3082-CJW, 2016 WL 1298129 at *12 (N.D. Iowa March 31, 2016) (driving short distances, writing checks, reading, and watching television supported the finding the claimant could frequently use near visual acuity). Finally, the ALJ found plaintiff could not read print smaller than 8-point font. (Tr. 19.) Based on the above, the court concludes substantial evidence supports the RFC for the period prior to July 13, 2017.

As of July 13, 2017, however, the ALJ found plaintiff could perform only occasional near acuity work and could not read print smaller than 12-point font. (Tr. 23.) At an eye exam on that date, plaintiff's corrected vision was reduced to 20/70 in both eyes. (Tr. 23, 567.) Plaintiff testified that in January 2018, about six months later, one of her eye doctors instructed her to stop driving due to her vision. (Tr. 54.) At that time, her corrected vision was 20/70 and 20/80. (Tr. 23, 689.)

Plaintiff argues that the ALJ arbitrarily determined that visual acuity of 20/70 rendered her disabled. That is not the case. The American Foundation for the Blind defines "low vision" as visual acuity of "20/70 or poorer in the better-seeing eye and cannot be corrected or improved with regular eyeglasses." American Foundation for the Blind, Low Vision and Legal Blindness Terms and Descriptions, https://www.afb.org/blindness-and-low-vision/eye-conditions/low-vision-and-legal-blindness-terms-and-descriptions (last visited Jan. 29, 2020). Low vision interferes with daily activities and does not permit the individual to perform all required daily activities. Id. Consistent with that, the vocational expert testified that an individual with corrected vision of 20/70 had

significant vocational limitations and was generally not considered able to work. (Tr. 60-61.) The ALJ's finding that plaintiff's disability began when her corrected vision was 20/70 was not arbitrary but was consistent with the definition of low vision as well as with the vocational expert's testimony.

Plaintiff also contends her impairments became disabling before July 13, 2017 and that the ALJ failed to fully develop the record regarding her functional limitations. She argues the record does not contain record medical evidence addressing her functional limitations. Plaintiff argues the ALJ impermissibly interpreted ophthalmologic clinical findings to formulate RFC and should have obtained testimony from a medical expert, suggesting that a medical opinion was required. However, there is no requirement that an RFC finding be supported by a specific medical opinion. See Myers v. Colvin, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); Perks v. Astrue, 687 F.3d 1086, 1092–93 (8th Cir. 2012) (same). Here, contrary to plaintiff's assertion, the ALJ did not merely attempt to interpret complicated ophthalmologic findings, but relied on the commonly used vision measurements, as well as plaintiff's activities, in determining when her vision impairments became disabling.

Plaintiff also argues that the RFC limitations regarding font size do not correlate to the record evidence. Even assuming that the limitations regarding font size are not directly supported by the record, the vocational expert's testimony is clear that plaintiff could not perform her past relevant work if she could not perform frequent near acuity. (Tr. 58.) Font size had nothing to do with the vocational expert's answer. Additionally, the vocational expert testified that based on her experience, near acuity normally involves 12-point font. (Tr. 59.) In short, the ALJ's additional limitations regarding font size were not dispositive of the outcome of the case.

Plaintiff also argues the ALJ failed to account for her fluctuating vision. However, the ALJ specifically acknowledged plaintiff's fluctuating vision and concluded that the significant limitations in her RFC accounted for her visual limitations. (Tr. 23.)

The vocational expert's testimony further supports the ALJ's determination that plaintiff was not disabled prior to July 13, 2017. When answering a hypothetical question that set forth plaintiff's limitations in a manner consistent with the ALJ's eventual findings concerning her condition and functional limitations, the vocational expert testified that plaintiff could perform her past work as an educational specialist. (Tr. 58.) This testimony constitutes substantial evidence to

support the ALJ's decision that plaintiff could perform her past relevant work.  See 20 C.F.R. § 404.1560(b)(2).  Accordingly, substantial evidence supports the finding that plaintiff was not disabled prior to July 13, 2017.  (Tr. 24.)

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

/s/ David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 24, 2020.